UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                                    :
LOUIS NOWLIN,                                       :
                                                    :
                        Plaintiff,                  :
                                                    :               20 Civ. 2470 (JPC)
            -v-                                     :
                                                    :            OPINION AND ORDER
MOUNT SINAI HEALTH SYSTEM,                          :
                                                    :
                        Defendant.                  :
                                                    :
---------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

     Louis Nowlin, a physician assistant ("PA"), brings this case against his former employer, Mount Sinai Health System ("Mount Sinai"), alleging disability discrimination on account of his speech disorder. Pleading causes of action under federal, state, and city law, Nowlin alleges that Mount Sinai failed to provide reasonable accommodations for his disability, discriminated against him culminating in his termination, created a hostile work environment, and retaliated against him for engaging in protected activity.

     Mount Sinai moves for summary judgment on all claims. For reasons that follow, Mount Sinai's motion is granted with respect to Nowlin's hostile work environment claims and with respect to the aspect of Nowlin's retaliation claims tied to his termination. Summary judgment is denied as to Nowlin's failure-to-accommodate and disability discrimination claims, as well as his retaliation claim under New York City law relating to his placement on a "Performance Improvement Plan."

# I. Background

## A. Facts[1]

Nowlin suffers from a speech disorder called "cluttering." Pl. 56.1 Stmt. ¶ 35. As he explained at his deposition, this condition causes him to "jumbl[e] things together and . . . speak[] a little bit fast . . . , speaking faster than . . . what a normal pattern would be. It's cluttered together." Nowlin Dep. Tr. at 86:7-15. Nowlin said that while this disorder affects his daily life, he can still communicate while experiencing cluttering. *Id.* at 211:13-23.

In July 2014, Nowlin began working as a PA in the Department of Neurosurgery at Mount Sinai West, a hospital in Manhattan operated by Mount Sinai. Pl. 56.1 Stmt. ¶ 1. Because Nowlin worked weekend nights, attending physicians were rarely at the hospital during his shifts. *Id.* ¶¶ 2,

---

[1] The facts discussed herein are drawn from Mount Sinai's statement of material facts pursuant to Local Civil Rule 56.1, Dkt. 42, Nowlin's counter-statement pursuant to Rule 56.1, Dkt. 46 ("Pl. 56.1 Stmt."), and the materials submitted by the parties. Those materials include declarations, *see* Dkt. 32 ("McEvoy Decl."), Dkt. 44 ("Friedman Decl."), Dkt. 34 ("Flaim Decl."), Dkt. 50 ("Fiumecaldo Decl."), Dkt. 35 ("Ghatan Decl."), Dkt. 36 ("Hernandez Decl."), Dkt. 37 ("Isola Decl."), Dkt. 38 ("A. Rodriguez Decl."), Dkt. 39 ("N. Rodriguez Decl."), Dkt. 40 ("Schlachter Decl."), Dkt. 41 ("Valerio-Ramcharran Decl."), Dkt. 51 ("Plaza Decl."), Dkt. 54 ("Buccellato Decl."), and the deposition transcripts relied on by both parties, *see* Buccellato Decl., Exhs. 1 ("Nowlin Dep. Tr."), 2 ("Panov Dep. Tr."), 3 ("McNicholas Dep. Tr."), 5 ("Ghatan Dep. Tr."), 6 ("Swarup Dep. Tr.").

The Court disregards propositions in Rule 56.1 statements unsupported by admissible evidence. *See* Loc. Civ. R. 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."); Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) ("[D]istrict courts in the Southern and Eastern Districts of New York have interpreted current Local Rule 56.1 to provide that where there are no citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion." (quotation marks and alterations omitted)). Accordingly, the Court cites to only Nowlin's counter-Rule 56.1 statement where the parties do not dispute the fact, Nowlin has not offered admissible evidence to refute the fact, or Nowlin simply seeks to add his own "spin" on the fact or otherwise dispute the inferences from the stated fact.

8.  Nowlin also was the only PA on his shift until the last year of his employment, when an additional PA was hired.  Nowlin Dep. Tr. at 26:1-7, 81:2-17.

Mount Sinai West's Department of Neurosurgery is a trauma center.  Panov Dep. Tr. at 17:4-12.  Dr. Fedor Panov, an Assistant Professor of Neurological Surgery at Mount Sinai, *id.* at 9:3-7, explained that, while most neurosurgical procedures are scheduled, medical personnel at the Department of Neurosurgery also treat emergent issues such as traumatic brain injuries, spinal cord injuries, and hemorrhagic strokes, *id.* at 18:15-24.  Thus, according to Dr. Panov, the department handles "neurosurgical emergencies," which "need a response within seconds to minutes to minimize patient harm."  *Id.* at 17:7-12.  So if a patient were to arrive at the hospital with a traumatic brain injury, that patient would likely first go through the emergency room, and then be transferred to the Department of Neurosurgery for more specialized treatment.  *Id.* at 18:25-19:20.  Nowlin, however, seems to disagree with the suggestion that the department is busy or handles particular urgent matters.  *See* Nowlin Dep. Tr. at 123:4-5 (testifying that "there is never really any issue where you're that busy when you're at the trauma center"); *see also id.* at 123:7-9 (testifying that "there is nothing really that urgent that you can't stop what you're doing to call somebody back").

When he worked as a PA at the Department of Neurosurgery, Nowlin communicated with physicians regarding patients by both telephone and text message.  Pl. 56.1 Stmt. ¶ 9.  Dr. Panov testified that when a PA finds out about a traumatic brain injury or other emergency, they should "urgently . . . gather up as much information . . . as possible" and "timely communicate . . . up the chain," such as through "a phonecall within seconds" to the chief resident or the on-call attending physician.  Panov Dep. Tr. at 20:22-21:16, 22:17-25.  He further explained that "[v]erbal communication is . . . relied upon . . . in an emergency," and "at most times would be most

efficient," as the contacted physician may be "operating," "driving," or "scrubbed into surgery" such that they "could not look at their phone," but Dr. Panov noted that text messages or email may also be used. *Id.* at 23:10-24:14.   Dr. Saadi Ghatan, a neurosurgeon who at some point became the Site Chair of the Department of Neurosurgery, testified that "in an emergency," a physician "must be able to assess if . . . the physician's assistant . . . is understanding them and able to carry out their recommendations," requiring a "conversation" rather than "text messaging." Ghatan Dep. Tr. at 8:6-22, 38:3-19; *see* McEvoy Decl., Exh. 1 at 128.   At the same time, Dr. Ghatan agreed that "both verbal and text message[s] can be useful" in an emergency.   Ghatan Dep. Tr. at 25:16-26:3.

Dr. Ghatan testified that doctors "were understanding of [Nowlin's] speech impediment and would allow him the time to be able to say what he needed to." *Id.* at 37:6-13.   Dr. Panov testified that while Nowlin had "issue[s] [with] the organization of the sentences," those issues were not to the point that he thought that Nowlin had a speech impediment.   Panov Dep. Tr. at 44:18-24.   And Dr. Ruprenda Swarup, the former Director of Neurocritical Care at Mount Sinai, testified that Nowlin "communicated just fine," and that he "never had an issue."   Swarup Dep. Tr. at 10:13-17, 36:8-18.   The "problem" with Nowlin, as Dr. Ghatan explained, was not with how he would speak, but rather Nowlin's "understanding of what was going on with the patient or his ability to follow through."   Ghatan Dep. Tr. at 37:9-12; *see id.* at 37:12-13 ("That was where the difficulty was.   The content.").

Nowlin claims to have been on the receiving end of various negative remarks while employed at Mount Sinai.   Many of these statements are, to an extent, disputed by the alleged speaker.   First, Nowlin testified that Dr. Swarup repeatedly warned Nowlin that Dr. Panov wanted to fire Nowlin due to his speech, and encouraged Nowlin to find another, less demanding, position.

Nowlin Dep. Tr. at 39:20-49:24.  Nowlin also testified that, during a January 2018 phone call, he asked Dr. Swarup whether his inability to communicate effectively was because of his speech impediment, and Dr. Swarup confirmed that it was.  *Id.* at 68:18-69:4.  Nowlin also said that Dr. Swarup told him that Dr. Ghatan and Dr. Panov hated Nowlin.  *Id.* at 54:16-23.  Dr. Swarup testified, however, that he told Nowlin that if anyone tried to fire Nowlin, Dr. Swarup would act to protect him, and that if Nowlin left, Dr. Swarup would serve as a reference for him.  Swarup Dep. Tr. at 57:2-16.  Dr. Swarup also said that while Dr. Panov had not told him directly that he was trying to get Nowlin fired, he had inferred that Dr. Panov did not think well of Nowlin.  *Id.* at 39:11-19.  But Dr. Swarup denied telling Nowlin that Dr. Ghatan and Dr. Panov hated Nowlin, *id.* at 68:6-16, and denied that he thought that Nowlin's speech impediment motivated Dr. Panov's negative opinion of Nowlin, *id.* at 29:8-17.

Second, Nowlin testified that Nathanial Rodriguez, an office supervisor in the Department of Neurosurgery, told Nowlin multiple times that Dr. Ghatan and Dr. Panov hated Nowlin.  Nowlin Dep. Tr. at 50:7-51:19.  Nathaniel Rodriguez denied saying that, however.  N. Rodriguez Decl. ¶ 2.  According to Nowlin, Nathaniel Rodriguez also told Nowlin that a new PA named Fabiola Plaza was hired to replace him in November 2018.  Nowlin Dep. Tr. at 175:24-176:16; Plaza Decl. ¶ 1.  Nathaniel Rodriguez also denied telling Nowlin that Plaza was his replacement, N. Rodriguez Decl. ¶ 3, and Plaza denied that she was, Plaza Decl. ¶ 1.

Third, Nowlin testified that Sharon Lai, another PA, related a conversation that she had with Dr. Panov during which Dr. Panov voiced his desire to fire Nowlin.  Nowlin Dep. Tr. at 51:20-52:12.  According to Nowlin, Lai explained that Dr. Panov said his "job is to get rid of the weakest link, and that's [Nowlin], and [Lai is] next."  *Id.* at 51:25-52:7.  Lai also told Nowlin that she was very emotional after her conversation with Dr. Panov and went to see Dr. Swarup, who

5

told her to tell Nowlin to find a new job before he was fired.  *Id.* at 52:17-22.  Dr. Swarup confirmed that Lai mentioned Dr. Panov's "weakest link" comment to him, but he did not consider the criticism to be related to Nowlin's speech.  Swarup Dep. Tr. at 18:15-21:6; 29:8-17.  And Dr. Panov denied making that comment to Lai.  Panov Dep. Tr. at 108:2-17.

Fourth, Nowlin alleged that Dr. Ghatan convened a meeting regarding empathy towards patients after an incident on Nowlin's shift involving a patient who was experiencing seizures.[2] Nowlin Dep. Tr. at 179:13-180:25.  Nowlin testified that, during the meeting, Dr. Ghatan criticized Nowlin's ability to communicate effectively.  *Id.* at 195:8-14.  Dr. Ghatan testified that he considered Nowlin an "empathic human being," Ghatan Dep. Tr. at 42:21-25, and denied using Nowlin as an example of someone who failed to display empathy, Ghatan Decl. ¶ 2(a).

On November 3, 2017, Nowlin received his 2017 Performance Appraisal, which was completed by Frank Fiumecaldo, the Chief Neurosurgery PA at Mount Sinai West.  Pl. 56.1 Stmt. ¶ 12; *see also* McEvoy Decl., Exh. 1 at 96-103 ("Performance Appraisal").  The Performance Appraisal assessed that Nowlin needed improvement in a variety of areas, including making rounds, writing notes, and discussing care plans with attending physicians; regulating medications and treatments; maintaining charts and patient records; possessing knowledge and skills necessary for care; planning; and productivity.  Pl. 56.1 Stmt. ¶ 13.  The Performance Appraisal advised that Nowlin should "[a]rrive one hour early each week" to "review [the] patient census," which would provide "additional instruction on patient assessment from [the] neurological standpoint." Performance Appraisal at 6; *see also* Pl. 56.1 Stmt. ¶ 14.  Overall, Nowlin's performance score was 1.64 out of 3 and his professionalism score was 1.97 out of 3, which made him a "[s]trong [c]ontributor" on the evaluation's rubric.  Performance Appraisal at 7.

---

[2] The Complaint alleges that this meeting occurred in April 2019.  Complaint ¶ 50.

In the spring of 2018, Nowlin encountered three performance-related issues.  First, on March 30, 2018, the chief neurosurgery resident complained to Dr. Panov that Nowlin failed to follow instructions on pain management for an overnight patient.  *See* Panov Dep. Tr. at 144:22-146:18; McEvoy Decl., Exh. 2 at 57; *see also* Pl. 56.1 Stmt. ¶¶ 16-17.

Second, on May 6, 2018, an emergency physician at a different Mount Sinai hospital, St. Luke's, paged Eileen Chen, a junior PA at Mount Sinai West, asking for help contacting the St. Luke's neurosurgery department.  *See* Panov Dep. Tr. at 132:4-137:16; McEvoy Decl., Exh. 2 at 55-56.  According to Chen, when she asked Nowlin for help, Nowlin told her to tell the caller to keep paging St. Luke's.  McEvoy Decl., Exh. 2 at 55-56.  Chen wrote an email describing the incident, which eventually reached Dr. Panov, who replied, and testified, that the correct procedure was instead to contact a resident or attending physician to attempt to solve the problem.  *Id.*; Panov Dep. Tr. at 133:23-137:25.  Nowlin disputed Chen's account.  According to Nowlin, after he instructed Chen to contact the on-call attending physician, Nowlin noticed that the on-call attending physician was actually in the room with him and relayed the message directly to the attending himself.  Nowlin Dep. Tr. at 117:17-118:16.  Nowlin maintained that he then told Chen that the attending would address the situation.  *Id.* at 118:16-18.

Third, a pre-residency neurosurgery fellow complained to Dr. Panov about an incident involving Nowlin on the night of May 10, 2018.  Pl. 56.1 Stmt. ¶ 23; McEvoy Decl., Exh. 2 at 54. The fellow performed an urgent procedure in the emergency room, assisted by another PA, Pl. 56.1 Stmt. ¶ 25, and Nowlin was responsible for minding the pager, Panov Dep. Tr. at 125:14-126:10; McEvoy Decl., Exh. 2 at 54.  After about thirty minutes, the fellow realized that nobody was answering the pager, so he scrubbed out to do it himself and discovered that Nowlin was getting dinner.  Panov Dep. Tr. at 125:14-126:15; McEvoy Decl., Exh. 2 at 54.  Nowlin, though,

claimed that the other PA was responsible for minding the pager, and denied that he was getting dinner.  Nowlin Dep. Tr. at 124:3-24.

On May 24, 2018, Dr. Panov forwarded emails regarding the three 2018 disputes to Barbara Soto, the practice manager, and asked her to address them with Nowlin.  Pl. 56.1 Stmt. ¶ 29.

On May 10, Nowlin met with Ann McNicholas, the hospital's Director of Labor and Employee Relations, and informed her that he had a speech fluency disorder.  Pl. 56.1 Stmt. ¶¶ 30, 34.  At the meeting, Nowlin complained that Dr. Swarup asked him to find a new job before he was fired, and that Lai had said that Dr. Panov said that Lai and Panov were the weakest links in their department.  *Id.* ¶ 31.  McNicholas also claimed that Nowlin complained that he was receiving criticism due to his performance, *see* McNicholas Dep. Tr. at 58:12-20, but Nowlin denied making such a complaint, *see* Nowlin Dep. Tr. at 65:19-66:3; Pl. 56.1 Stmt. ¶ 31.

After the meeting, McNicholas spoke with Dr. Swarup, Lai, and Jennifer Savitzky-Fuerstein, an administrative director at the hospital.  McNicholas Dep. Tr. at 41:4-10, 71:14-25. McNicholas recalled that she spoke almost immediately to Dr. Swarup, who expressed concerns about Nowlin's performance, but not his speech.  *Id.* at 41:7-15, 48:24-49:11, 164:16-22. McNicholas also recalled that Lai confirmed Dr. Panov's comment that Nowlin and she were the "weak links" in the Department of Neurosurgery.  *Id.* at 68:21-69:16.  Yet, according to McNicholas, Lai maintained that Dr. Panov's comments related to Nowlin's performance, rather than his speech, and that Lai had not observed discrimination against Nowlin.  *Id.* at 69:21-70:18. Savitsky-Fuerstein also told McNicholas that she had not observed concerns about Nowlin's speech, but only about his performance.  *Id.* at 71:17-72:13.

McNicholas concluded that the Department of Neurosurgery was concerned with Nowlin's performance, but not his speech.  *Id.* at 72:5-73:12.  McNicholas recommended that Nowlin be put

on a Performance Improvement Plan ("PIP"), and told Savitzky-Fuerstein and Soto that Nowlin should have been put on such a plan at the end of 2017. *Id.* at 180:25-181:14, 184:15-185:6; Friedman Decl., Exh. J. McNicholas did not typically initiate or draft PIPs, though she sometimes gave feedback to other supervisors on them. McNicholas Dep. Tr. at 17:17-18:24.

On May 22, 2018, twelve days after meeting with McNicholas to raise his complaints, Nowlin sent her a request for an accommodation for his cluttering. Pl. 56.1 Stmt. ¶ 44. Nowlin requested to, first, call physicians to inform them of an upcoming written communication; second, text or email the physician to convey information about the patient; and third, receive follow-up questions "either verbally (if they require limited responses) or through the written format for longer replies." McEvoy Decl., Exh. 1 at 104. Nowlin also invited McNicholas to contact his speech therapist "to determine other possible solutions" in the event of "further difficulties." *Id.* Nowlin testified that his proposed accommodation would not have excluded the use of phone calls in "emergency situations," and that in his view, the accommodation merely formalized his typical practice of using text messages in addition to calls. Nowlin Dep. Tr. at 74:11-75:21; *see also* Panov Dep. Tr. at 75:16-18 ("The previous several years of communicating with [Nowlin] on-call were the things that he described in the request."). Nowlin said that nobody at Mount Sinai "s[at] down with [him] and listene[ed] to [him]" regarding the precise contours of his idea. Nowlin Dep. Tr. at 74:18-20.

Nowlin's request was evaluated by the Department of Neurosurgery at Mount Sinai West, including Dr. Ghatan; Dr. Panov; Dr. Joshua Bederson, the Chair of Neurosurgery for Mount Sinai; Tracy Breen, the Chief Medical Officer for Mount Sinai West; and Mount Sinai's legal department. Pl. 56.1 Stmt. ¶ 46; McEvoy Decl., Exh. 2 at 58-59. Dr. Panov was concerned that Nowlin's proposed procedures could cause "delay in an emergency," and that an attending may

not be able to review a text communication while driving or operating.  Panov Dep. Tr. at 76:12-20.  To that end, Dr. Panov claimed that he had previously criticized Nowlin for relying heavily on electronic communications.  *Id.* at 75:24-76:7.  Dr. Bederson shared similar concerns.  *See* McEvoy Decl., Exh. 2 at 58.  And Dr. Ghatan feared that text messaging could lead to mistakes or misunderstandings.  Ghatan Dep. Tr. at 32:11-33:3.

On June 7, 2018, Nowlin met with McNicholas, Dr. Panov, Savitzky-Fuerstein, and Soto regarding his accommodation request.  Pl. 56.1 Stmt. ¶ 48.  The group denied the request, explaining the concerns summarized above.  McNicholas Dep. Tr. at 82:21-83:24.  Nowlin testified that when he tried to explain his request, Dr. Panov cut him off, and the group did not discuss the proposal or "try[] to find an alternative."  Nowlin Dep. Tr. at 98:8-99:8.  Nowlin also testified that at the end of the meeting, he was advised to expect "a disciplinary action" at their next meeting.  *Id.* at 99:5-7.  As discussed below, at the next meeting, Nowlin received a PIP.  *Id.* at 99:7-8.

On June 20, 2018, McNicholas emailed Nowlin a list of open PA positions in other departments.  Pl. 56.1 Stmt. ¶ 52; McNicholas Dep. Tr. at 81:4-8; McEvoy Decl., Exh. 1 at 105-08.  McNicholas did not know whether the open positions would allow Nowlin to use more text-based communication than the neurosurgery position.  McNicholas Dep. Tr. at 84:9-25; Nowlin Dep. Tr. at 106:19-24.  Nowlin expressed some initial interest in a cardiac surgery PA position.  McEvoy Decl., Exh. 1 at 106.  But ultimately Nowlin did not apply for any of the positions; he testified that he was concerned that they were in different specialties from his, were more junior to his current position, and would not better accomodate his speech issue.  Nowlin Dep. Tr. at

106:13-107:24.[3]   Sophia Hernandez, a senior compensation analyst at Mount Sinai, attested, however, that some of the other positions had similar benefits and pay.  Hernandez Decl. ¶¶ 4-6.

Nowlin attended the foreshadowed disciplinary meeting on July 12, 2018, at which the three complaints that Dr. Panov forwarded to Soto on May 24, 2018 were discussed.  McEvoy Decl., Exh. 1 at 116.  Nowlin was placed on a sixty-day PIP at this meeting.  Pl. 56.1 Stmt. ¶ 56; McEvoy Decl., Exh. 1 at 117-20.  While McNicholas testified that PIPs are "not disciplinary actions," but rather methods to "work[] with the employee to help them meet . . . expectations," McNicholas Dep. Tr. at 133:3-9, the PIP itself provided that "[f]ailure to meet or exceed [the PIP] . . . will result in further disciplinary action, up to and including termination," among other consequences, and listed "deficiencies" in Nowlin's performance, Friedman Decl., Exh. M ("PIP") at 1, 4.  The instances of performance deficiencies were the three 2018 incidents that Dr. Panov sent to Soto, discussed above.  PIP at 1; Pl. 56.1 Stmt. ¶ 63.  The PIP also identified the same "Areas of Concern" as the 2017 Performance Appraisal.  *Id.* at 1; Pl. 56.1 Stmt. ¶ 59.  It laid out as goals that Nowlin improve his communication when handling the pager, his decisions and evaluations regarding patients, and his neuroradiology interpretation.  PIP at 1; Pl. 56.1 Stmt. ¶ 60. To achieve those goals, the PIP directed Nowlin to attend certain workplace conferences, read a handbook, and seek guidance from coworkers on decisions.  PIP at 3; Pl. 56.1 Stmt. ¶ 61.

In the summer of 2018, Nowlin submitted a complaint to Mount Sinai's Corporate Compliance regarding the failure of Mount Sinai's Department of Labor Relations to investigate his May 2018 complaint to McNicholas; the denial of his request for an accommodation for his

---

[3] On August 9, 2018, McNicholas told Nowlin that his accommodation may be possible in a different position, but Nowlin rejected the offer because he was already in the PIP process and because "the solution" "didn't solve the problem."  Nowlin Dep. Tr. at 138:14-140:23; McEvoy Decl., Exh. 1 at 111.

speech disorder; and his placement on a PIP.  Pl. 56.1 Stmt. ¶ 64; Nowlin Dep. Tr. at 160:13-24, 162:25-163:11.  On August 16, 2018, Norm Werner, Director of Compliance, sent Nowlin a letter. McEvoy Decl., Exh. 1 at 124-25; Pl. 56.1 Stmt. ¶ 65.  Werner wrote that a group at Mount Sinai reevaluated the request and agreed with the decision to deny the accommodation "based on a number of factors, the most important . . . being patient safety."  McEvoy Decl., Exh. 1 at 124. Werner also said that "the denial of [Nowlin's] ADA request is not related in any way to [Nowlin's] . . . [PIP]," which "relate[d] to the [2017] annual appraisal that [Nowlin] received in January 2018."  *Id.*  Werner further noted that while "the PIP optimally should have been implemented shortly after the appraisal . . . in this instance there was a delay."  *Id.* at 125.

On August 20, 2018, Nowlin met with McNicholas and Hal Budnick, a Senior Labor Relations Specialist, to discuss his complaints about Dr. Panov calling him the weakest link, the Department of Neurosurgery looking to fire him, and his placement on the PIP.  Pl. 56.1 Stmt. ¶¶ 66-68.  McNicholas and Budnick told Nowlin that his complaints had been found to be unsubstantiated.  *Id.* ¶ 69.

On September 18, 2018, Nowlin successfully completed the PIP.  Pl. 56.1 Stmt. ¶ 72.  Dr. Panov testified that Nowlin's performance had improved through the PIP process.  Panov Dep. Tr. at 86:8-92:8.

The National Commission on Certification of Physician Assistants ("NCCPA") offers certifications for physician assistants; such certifications require PAs to pass a test, then continue to pass tests every six years to maintain the certification.  Pl. 56.1 Stmt. ¶¶ 73-74.  The parties dispute whether Mount Sinai required PAs to maintain certification.  *Id.* ¶ 73. Many of Mount Sinai's witnesses corroborated such a requirement, including Stephan Flaim, Mount Sinai's Senior Director of Medical Staff Services, Flaim Decl. ¶ 3; Dr. Ghatan, *see* Ghatan Dep. Tr. at 45:12-15;

Heather Isola, Mount Sinai's Director of Physician Assistant Services, *see* Isola Decl. ¶ 3; and Leslie Schlachter, the Chief Advanced Practice Provider for Neurosurgery at Mount Sinai, *see* Schlachter Decl. ¶ 3.  On the other hand, the job listing for Nowlin's position listed the certification as only a "preferred" qualification.  Friedman Decl., Exh. D.[4]   In any event, Nowlin's NCCPA certification had expired in January 2017. Pl. 56.1 Stmt. ¶ 79.  Nowlin testified that he informed Fiumecaldo and the credentialing department at Mount Sinai of the lapse the next month.  Nowlin Dep. Tr. at 166:18-24, 171:2-11.

In the summer of 2019, the Department of Neurosurgery prepared to transition to become a neurosciences department.  Pl. 56.1 Stmt. ¶ 76.  As part of the transition, Schlachter checked the certifications for all Mount Sinai West neurosurgery PAs and discovered that Nowlin's had expired.  Schlachter Decl. ¶ 3.  Schlachter informed Medical Staff Services at Mount Sinai, which told her that the certification was required.  *Id.* ¶ 4.  On June 18, Flaim directed the "remov[al of] Mr. Nowlin from all clinical activity effective immediately."  Flaim Decl. ¶ 4, Exh. 1.

That same day, Nowlin met with Dr. Ghatan, Fiumecaldo, and Schlachter regarding his certification.  Pl. 56.1 Stmt. ¶ 84.  Right before the meeting started, according to Nowlin, Dr. Ghatan said that he thought Nowlin would have brought his service dog and laughed.  Nowlin Dep. Tr. at 193:2-21.  Nowlin also testified that Dr. Ghatan expressed concern over Nowlin's ability to "communicate effectively," "the same words that he would use all the time."  *Id.* at 195:1-7.  The three management representatives told Nowlin that he would receive paid time off until he

---

[4] At his deposition, Dr. Swarup said, "I don't think that [letting a certification lapse is] a fireable offense.  I hope not.  Because—I don't know.  I don't know if that's a fireable offense."  Swarup Dep. Tr. at 56:8-12.  Nowlin testified that when he told Fiumecaldo that his certification lapsed, Fiumecaldo replied, "[w]ell, they can't fire you for that."  Nowlin Dep. Tr. at 167:21-22.  Fiumecaldo said that he did not tell Nowlin that he could not be fired, but that "he would not immediately be fired" and needed to be recertified.  Fiumecaldo Decl. ¶ 3.

passed the certification exam, and told Nowlin to stay in touch; Nowlin agreed to take the exam the next week, on June 25.  Nowlin Tr. 203:9-14; Schlachter Decl. ¶¶ 8-9; *see also* Schlachter Decl., Exh. 2 (emails from Dr. Ghatan and Schlachter to Nowlin regarding the arrangement). Nowlin failed to take the exam on that date, however.

Mount Sinai's witnesses have contended that Nowlin did not follow up after he failed to take the exam on June 25.  *See* Ghatan Decl. ¶ 3; Ghatan Tr. at 51:20-52:5.  Schlachter and Adrianne Rodriguez, who was Dr. Bederson's administrative assistant at the time, said that they called Nowlin after June 25 and received no response.  Schlachter Decl. ¶ 10; A. Rodriguez Decl. ¶ 2.  Adrianne Rodriguez attested that, on July 10, 2019, she got in touch with Nowlin, who told her that he had not taken the exam on June 25, but would take it the following week, though he had not set a test date.  A. Rodriguez Decl. ¶ 3.  While Nowlin told Adrianne Rodriguez that he would follow up with her as soon as possible, he never did so.  *Id.* ¶¶ 3-6.  Miriel Valerio-Ramcharran, a practice manager in the Department of Neurosurgery, set up a meeting with Nowlin, Dr. Ghatan, Fiumecaldo, and Schlachter for July 19, 2019.  Valerio-Ramcharran Decl. ¶¶ 3-4. Valerio-Ramcharran sent Nowlin a calendar invitation (which he tentatively accepted), texted him, and left him a voicemail.  *Id.* ¶ 5-6.

Nowlin's story differs.  He said that he went to the test center on June 25, but had a panic attack and did not take the examination.  Nowlin Dep. Tr. at 198:9-17.  He claimed that he informed his doctor that he was unable to take the examination and applied for leave under the Family and Medical Leave Act ("FMLA").  *Id.* at 198:18-23.  Nowlin testified that, later that week, he tried to call Schlachter, but she did not pick up or return his call.  *Id.* at 198:24-199:20.  Schlachter's secretary returned his call, but Nowlin did not want to discuss his medical situation with Schlachter's secretary.  *Id.* at 200:4-14.  According to Nowlin, he did not learn of the July 19

meeting until he received discovery in this case, did not know who Valerio-Ramcharran was, and never received a phone call from her.  *Id.* at 201:3-202:6.

Regardless, Nowlin did not attend the July 19 meeting, and Mount Sinai fired him that day. McEvoy Decl., Exh. 1 at 128; Valerio-Ramcharran Decl. ¶ 9.

## B.  Procedural History

Nowlin filed suit on March 20, 2020, Dkts. 1, 5 ("Complaint"), and the case was assigned to the Honorable Katherine Polk Failla.  The Complaint brings multiple causes of action against Mount Sinai under the Americans with Disabilities Act ("ADA"), 42 US.C. § 12101 *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq*.  Complaint ¶¶ 66-95.  On September 29, 2020, the case was reassigned to the undersigned.

Mount Sinai moved for summary judgment on July 26, 2021, Dkt. 31, 43 ("Motion"), Nowlin filed a brief in opposition on August 9, 2021, Dkt. 45 ("Opposition"), and Mount Sinai filed a reply brief on August 16, 2021, Dkt. 52 ("Reply").  Both parties read Plaintiff's discrimination claims as encompassing failure-to-accommodate, discrimination resulting in his termination, hostile work environment, and retaliation theories.  *See* Motion at 1-2; Opposition at 1.  The Court thus construes the Complaint likewise.  *See Berger v. N.Y.C. Police Dep't*, 304 F. Supp. 3d 360, 368 n.8 (S.D.N.Y. 2018).

## II.  Legal Standard

A district court should grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,'" and "[a] fact is material if it 'might affect the

outcome of the suit under the governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party is entitled to judgment as a matter of law when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quotations and citations omitted).  In deciding a motion for summary judgment, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009) (quoting *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001)).

### III.  Analysis

#### A.  Failure to Accommodate

The ADA prohibits discrimination against a "qualified individual with a disability . . .  by reason of such disability." 42 U.S.C. § 12132.  "In so-called reasonable-accommodation cases . . . the plaintiff's burden 'requires a showing that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'" *Graves v. Finch Pruyn Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006) (quoting *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d

113, 118 (2d Cir. 2004)).[5] After the plaintiff establishes a *prima facie* case, "[t]he burden . . . shifts to the defendant to rebut the reasonableness of the proposed accommodation" by showing that it "would cause the employer to suffer an undue hardship." *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 189 (2d Cir. 2015) (quotations and alterations omitted). The same standards govern claims under the NYSHRL and the NYCHRL. *See Frilando v. N.Y.C. Transit Auth.*, 463 F. Supp. 3d 501, 514 (S.D.N.Y. 2020); *Nieblas-Love v. N.Y.C. Housing Auth.*, 165 F. Supp. 3d 51, 73 (S.D.N.Y. 2016).

Here, Mount Sinai seeks summary judgment on Nowlin's failure to accommodate claims on only two grounds. First, Mount Sinai challenges the accommodation requested by Nowlin. And second, Mount Sinai maintains that it offered Nowlin a reasonable accommodation, which he did not accept.

### 1. Nowlin's Proposed Accommodation

As to the first argument, Mount Sinai maintains that Nowlin failed to show that his proposed accommodation is reasonable and contends that his proposal would have presented an undue hardship on the Department of Neurosurgery. *See* Motion at 13. "[T]he plaintiff bears . . . a light burden of production as to the facial reasonableness of the accommodation" that may be

---

[5] The Complaint alleges that Nowlin "suffers from three disabilities that [are] actual or perceived," specifically, "Speech Fluency Disorder (which disrupted [Nowlin]'s flow of speech), Generalized Anxiety Disorder (which mentally impaired [Nowlin]'s ability to concentrate or navigate daily life activities without exaggerated worry), and Attention Deficit Hyperactivity Disorder ('ADHD') ([which] impaired [Nowlin]'s ability to keep his attention, manage hyperactivity and control impulsive behavior)." Complaint ¶¶ 17-18. On summary judgment, Nowlin advances claims based only on an alleged disability for cluttering, and Mount Sinai has not challenged that cluttering qualifies as a disability under the ADA, the NYSHRL, and the NYCHRL. The Court therefore assumes for purposes of this Opinion and Order that Nowlin has sufficiently alleged a disability for purposes of these laws. The parties also do not dispute that Mount Sinai is an employer covered by these statutes.

"satisf[ied]" by showing that the accommodation is "plausible." *Dean*, 804 F.3d at 190 (quotations omitted). The "undue hardship" defense requires showing that the action would "requir[e] significant difficulty or expense." *McMillan v. City of New York*, 711 F.3d 120, 128 (2d Cir. 2013) (quoting 42 U.S.C. § 12111(10)(A)). The ADA's enumerated factors used to determine whether an accommodation presents an undue hardship "include (1) the employer's type of operation . . .; (2) the employer's overall financial resources; (3) the financial resources involved in the provision of the reasonable accommodation; and (4) the impact of such accommodation upon the employer's operation." *Rodal*, 369 F.3d at 122 (citing 42 U.S.C. § 12111(10)(B)).

Nowlin's requested accommodation would have memorialized modified procedures for his communications with physicians, including the use of text messages and emails to convey information regarding patients' statuses and the reduction of verbal communication of such information. Nowlin Dep. Tr. 88:9-89:6; *see also* McEvoy Decl., Exh. 1 at 104 (Nowlin's email proposing the accommodation, explaining that "[d]ue to the fact that telephone conversations can be very difficult for people who stutter, I request to be provided an alternative means of communication (i.e. text message, email) to present detailed information regarding [a] patient's status"). To recap, Nowlin proposed that first he would make a quick phone call to the physician to alert the physician of an incoming message. Nowlin Dep. Tr. at 88:16-20. Next, he would send a written text or email to the physician. *Id.* at 88:20. Follow-up questions and answers would then be communicated either verbally, if they required limited responses, or through text message or email, if they required longer replies. *Id.* at 88:21-24. Nowlin would have used a phone in emergency situations. *Id.* at 88:11-14.

Nowlin has met his "light burden of production as to the facial reasonableness" of his proposed accommodation. *Dean*, 804 F.3d at 190 (quotations omitted). Most significantly, Mount

Sinai does not dispute that Nowlin had used similar methods to communicate with physicians for years before submitting his formal accommodation request.  *See* Panov Dep. Tr. at 75:16-18; Nowlin Dep. Tr. at 25:8-25; Pl. 56.1 Stmt. ¶ 9.  And Dr. Ghatan, the Site Chair of the Department of Neurosurgery who eventually signed Nowlin's termination letter, testified that Nowlin's form of communication generally did not present a problem.  Ghatan Dep. Tr. at 36:23-37:3; *see* McEvoy Decl., Exh. 1 at 128.  And in fact, Ghatan testified that after the request was denied, Nowlin continued to communicate both via text and verbally with on-call doctors.  Ghatan Dep. Tr. at 36:15-22.

Mount Sinai's motion, which largely focuses on the inefficiencies of text messages in emergency situations, *see* Motion at 13-14, does not rebut the reasonableness of Nowlin's proposed accommodation by showing an undue hardship for a few reasons.  First, again, Nowlin maintains that his proposed accommodation largely tracked his practices during the approximately three years he had worked at Mount Sinai West, and Mount Sinai has presented no evidence showing otherwise.  *See* Nowlin Dep. Tr. at 75:8-12 ("Basically, nothing will change.  I will be given permission, you know, officially to use WhatsApp, which is what we already did in the first place.  I was told no.").  And returning again to Dr. Ghatan's deposition testimony, he agreed that Nowlin's hybrid communication with doctors by text and phone generally did not present a problem, Ghatan Dep. Tr. at 36:23-37:3, and acknowledged that "both verbal and text messages [can] be useful for an on-call doctor to respond to an emergency," *id.* 25:16-26:3.  Dr. Ghatan also testified that his concerns with Nowlin's communication did not arise from the "form" of Nowlin's communications, but rather their "content."  *Id.* at 36:15-37:3.  Finally, Nowlin's proposal envisioned him communicating by phone in the event of an emergency.  Nowlin Dep. at 88:11-14; *see also id.* 90:3-6 ("But if there was an emergency that's happening and I needed to call [the

physician], I would call him, you know, whoever it was, to let them know, hey, this is happening."). Thus, whether Nowlin's proposed accommodation presented an undue burden cannot be resolved at summary judgment on the current record, and is for a jury to decide.

The parties also dispute whether Mount Sinai made "a reasonable effort to determine the appropriate accommodation" in "good faith" through "a flexible, interactive process," as required. *Goonan v. Fed. Rsrv. Bank of N.Y.*, 916 F. Supp. 2d 470, 480 (S.D.N.Y. 2013) (quotations omitted). Nowlin testified that his meeting with McNicholas, Savitzky-Fuerstein, and Dr. Panov to discuss his reasonable accommodation request was perfunctory, which possibly led to management's misunderstanding of how the request would apply in emergencies. Nowlin Dep. Tr. at 98:8-99:8; *see also id.* at 74:11-22. At his deposition, Nowlin recalled that meeting:

> So, basically, I was trying to explain to [McNicholas, Savitzky-Fuerstein, and Dr. Panov] what the request was about. But within two minutes, Dr. Panov abruptly wanted to end the meeting, and he said the request was denied, and there's no time.
>
> And then, as he was leaving, he said to [McNicholas] . . . our next meeting will be a disciplinary one, correct. She said yes, then he left.
>
> So, basically, my accommodation request was denied without reading the document, or even discussing it or trying to find an alternative in the process. That didn't happen at all. It was just denied.

*Id.* at 98:16-99:4. Mount Sinai responds that Nowlin's submission of a "detailed written . . . request" obviated the need for further inquiries, Reply at 3, but as Nowlin noted at his deposition, the request "does not say anything about exclusively" using the proposed three-step method, Nowlin Dep. Tr. at 74:17-22. Indeed, the request—which was only one paragraph long—explicitly invited Mount Sinai to propose "other possible solutions" if it presented "further difficulties," and to discuss such modifications with Nowlin's speech therapist. McEvoy Decl., Exh. 1 at 104.

In sum, while Mount Sinai is correct that there is evidence in the record "regarding the serious patient safety concerns" created by Nowlin's request, Motion at 13, Nowlin has also come

forward with evidence that much of his proposal had been unofficially in place for years, without causing problems. These factual disputes bearing on the accommodation's reasonableness cannot be resolved at this stage.

### 2. Mount Sinai's Proposed Alternative Accommodation

Mount Sinai next argues that it offered Nowlin a reasonable accommodation in the form of a position as a PA in a different department within the hospital system. Motion at 14-15. "[E]mployers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee." *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 95 (2d Cir. 2015). "All that is required is effectiveness," such that the employee will be "enable[d] . . . to perform the essential functions of [the] position," but "[a]n *ineffective* modification . . . will not *accommodate*." *Id.* at 94-95 (quotations omitted). The Court must "look[] to the alternative accommodation to determine whether it was plainly reasonable." *Durick v. N.Y.C. Dep't of Ed.*, 202 F. Supp. 3d 277, 292 (E.D.N.Y. 2016).

Nowlin argues that Mount Sinai has provided no evidence that a transfer would accommodate his disability. Opposition at 9-10. Nowlin testified that while he was initially interested in a transfer, he rejected the opportunity in part because the possible positions would not address his speech issues, and because they would have essentially entailed demotions. Nowlin Dep. Tr. at 106:13-107:24, 140:22-23. As he testified at his deposition, when asked about these positions:

Q.    Did you ever apply for any transfer positions?

A.    No.

Q.    Why not?

A.    Number 1, the departments are not the same type of position that I have been used to. They are more like junior level, recent graduate position. And it doesn't actually solve the problem with the speech.

So why would any other department be any different from the Neurosurgery Department? It wouldn't solve the problem.

Q.    Why wouldn't it solve the problem?

A.    Because it doesn't address the accommodation request. It's not giving me a way to communicate, if there is a problem, you know, of the problems that I'm being denied for.

And number 2, the positions don't equal the same. A hematology associate is not the same position [as] a five-year nurse certified P.A. It has nothing to do with what I do now.

*Id.* at 106:25-107:24; *but see* Hernandez Decl. ¶¶ 3-6 (attesting that the positions proposed to Nowlin would have entailed similar benefits and pay). McNicholas, who proposed the transfer, likewise acknowledged at her deposition that she did not confirm whether any of the other possible positions would have allowed for Nowlin to communicate primarily in writing. McNicholas Dep. Tr. at 81:9-25; *see also* Reply at 4 (conceding that McNicholas did not "reach out to every department with a vacancy and determine whether they would accommodate" Nowlin).

Mount Sinai argues—for the first time in its reply brief[6]—that Nowlin's rejection of a transfer relieved its obligation to investigate whether one could be a reasonable accommodation. *See* Reply at 4. But Nowlin testified that he opted not to apply for a transfer *because* Mount Sinai failed to show that one would accommodate him, and Mount Sinai has proffered no evidence to the contrary.[7] While a plaintiff's rejection of the interactive process is a defense to a reasonable

---

[6] Because, as discussed, the Court rejects this argument, the Court need not consider whether Nowlin should be provided an opportunity to respond.

[7] To be sure, Nowlin also gave other reasons, including his concerns about the salary and seniority of the positions McNicholas suggested, Nowlin Dep. Tr. at 107:4-12, and the decision to put Nowlin on a PIP, *id.* at 139:11-22.

accommodation claim, "[c]ourts must deny . . . motions for summary judgment when presented with conflicting facts about the provenance of a breakdown." *Goonan*, 916 F. Supp. 2d at 480. And even on a well-developed record, assigning responsibility for a breakdown is fact-intensive, with "[n]o hard and fast rule." *Id.* (quotations omitted). On this sparse record, the Court cannot determine as a matter of law that Nowlin broke off the interactive process, thus halting Mount Sinai's obligation to proffer a reasonable accommodation.

## B. Disability Discrimination

The Court next turns to Nowlin's claims that he was terminated on account of his disability. Such disability discrimination claims under the ADA are evaluated using the *McDonnell Douglas* burden-shifting framework. To establish a *prima facie* case of disability discrimination under the ADA, Nowlin "must show by a preponderance of the evidence that: '(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.'" *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (quoting *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001)). "Where a *prima facie* showing is made . . . the burden shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason for its action.'" *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the defendant makes such a showing, "[t]he plaintiff then bears the ultimate burden to show that the employer's proffered reason was merely a pretext." *Id.* at 88-89 (quotation omitted). The same standards apply to discrimination claims under the NYSHRL. *See Bourara v. N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc., Emp. Benefit Funds*, No. 20-3092, 2021 WL 4851384, at *1 (2d Cir. Oct. 19, 2021). Under the NYCHRL, while the burdens are somewhat

modified, the plaintiff still must establish a *prima facie* case.  *See Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75-76, 76 n.13 (2d Cir. 2015).

Again, as noted above, Mount Sinai does not argue that Nowlin's speech condition was not a disability, nor does it deny being an employer subject to the ADA, the NYSHRL, or the NYCHRL.  Mount Sinai also does not contend that Nowlin was not otherwise qualified to perform the essential functions of a PA in the Department of Neurosurgery.  And of course, Mount Sinai's termination of Nowlin's employment qualifies as an adverse employment action.  But Mount Sinai does argue that Nowlin has not made a *prima facie* showing of disability discrimination because he has failed to proffer evidence that he suffered adverse employment actions because of his disability.  Motion at 15-20; *see Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019) ("[T]he ADA requires a plaintiff alleging . . . employment discrimination to prove that discrimination was the but-for cause of any adverse employment action.").

The most compelling evidence supporting Nowlin's discrimination causation argument comes from the June 18, 2019 meeting regarding his lack of an NCCPA certification.  Opposition at 11-13.  To recap, Nowlin met with Dr. Ghatan, Fiumecaldo, and Schlachter in Dr. Ghatan's office.  Pl. 56.1 Stmt. ¶ 84; Nowlin Dep. Tr. at 190:19-191:19.  The purpose of the meeting was to discuss Nowlin's lapsed NCCPA certification, and Nowlin was told that he would be placed on paid leave until he passed the certification exam.  Nowlin Tr. 191:20-25, 203:9-14; Schlachter Decl. ¶¶ 8-9; *see* Pl. 56.1 Stmt. ¶¶ 84-85.  On that same day, Flaim directed Nowlin's removal from all clinical activity on account of his inactive certification.  Flaim Decl. ¶ 4, Exh. 1.  Nowlin points to two comments allegedly made by Dr. Ghatan in connection with this meeting.  First, when Nowlin encountered Dr. Ghatan before the meeting in the hallway outside Dr. Ghatan's office, Dr. Ghatan allegedly commented that he had expected Nowlin to bring his service dog and

laughed.  Nowlin Dep. Tr. at 193:2-21.  Second, during the meeting itself, Dr. Ghatan allegedly criticized Nowlin's inability to "communicate effectively."  *Id.* at 195:1-7.

Mount Sinai argues that neither comment creates an inference of discrimination under the "stray remarks" doctrine.  Motion at 16-19.  Stray remarks do not establish a *prima facie* case of discrimination.  *See, e.g., Chan v. Donahoe*, 63 F. Supp. 3d 271, 293-94 (E.D.N.Y. 2014) (collecting cases).  When evaluating whether comments constitute stray remarks, courts in the Second Circuit "consider[] four factors: '(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).'"  *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (collecting cases).

These considerations prevent the Court from disregarding Dr. Ghatan's alleged remarks as stray at the summary judgment stage.  Starting with the context, Nowlin testified that this meeting occurred during a period when he was approved for FMLA leave on account of stress.  *See* Nowlin Dep. Tr. at 187:23-24, 190:9-18 (testifying that his leave approval was for "June 9, 2019 to September 8, 2019").  The alleged comments were made in the context of a meeting that resulted in Nowlin's paid suspension from work, and predated Nowlin's termination by just under a month.  *See* McEvoy Decl., Exh. 1 at 128; Valerio-Ramcharran Decl. ¶ 9.  They allegedly were made by a decisionmaker—indeed, Dr. Ghatan was the person who ultimately signed Nowlin's termination letter as the Site Chair for the Department of Neurosurgery.  *See* McEvoy Decl., Exh. 1 at 128; Valerio-Ramcharran Decl. ¶ 9.  And Mount Sinai apparently concedes that the comments were

made by a decisionmaker in close temporal proximity to Nowlin's termination. *See* Motion at 16-19.

As for the substance of the alleged comments, the record does not allow the Court to dismiss them as "stray."  A reasonable juror charged with assessing the witness testimony and making credibility assessments very well might disregard them as harmless; at the same time, though, a reasonable juror could also view them as discriminatory.  Dr. Ghatan conceded that he "asked Mr. Nowlin why he did not bring his dog with him to the June 18, 2019 meeting," but insisted that he "genuinely hop[ed] to see the dog" and did not laugh.  Ghatan Decl. ¶ 2(b).  Nowlin, however, testified that Dr. Ghatan did laugh and that Nowlin interpreted the comment very differently, perceiving it as insulting and derogatory, particularly given the context in which it was made.  He testified that he felt "that was . . . a very not nice comment," especially given that he was being put on discipline-related administrative leave and the comment was not made in private but in a hallway where "[e]verybody heard it."  Nowlin Dep. Tr. at 193:7-25.

As to Dr. Ghatan's second alleged comment, regarding Nowlin's ability "to communicate effectively," a reasonable factfinder also could conclude that it was a direct criticism of Nowlin's speech disorder.  Nowlin testified that Dr. Ghatan mocked him by criticizing his ability "to communicate effectively."  *Id.* at 195:2.  Nowlin added that Dr. Ghatan "said it," apparently disparaging references to Nowlin's inability to effectively communicate, "all the time to me, and also when I'm around or in meetings."  *Id.* at 195:10-12.  This included, according to Nowlin, the meeting when Dr. Ghatan allegedly criticized him for a lack of empathy.  *Id.* at 195:12-14.  To be sure, Dr. Ghatan testified that his concerns with Nowlin's performance arose not from the form of Nowlin's speech, but from Nowlin's "understanding of what was going on with the patient or his ability to follow through."  Ghatan Dep. Tr. at 37:9-11.  In other words, "the difficulty" was with

"[t]he content" of Nowlin's communications. *Id.* at 37:12-13. But Dr. Ghatan also acknowledged that he understood Nowlin to have a speech impediment, yet maintained that doctors "were understanding of [Nowlin's] speech impediment and would allow [Nowlin] the time to be able to say what he needed to." *Id.* at 37:6-8. In the end, the Court cannot determine on this cold record whether Dr. Ghatan's comment about Nowlin's inability "to communicate effectively" related solely to Nowlin's performance, or also to his disability. This too is for a jury to decide.[8]

And again, these comments were not allegedly made by a random employee in passing. They were made in the context of a disciplinary meeting to suspend Nowlin from work on grounds that he argues were baseless, namely his failure to keep an updated NCCPA certification. And they were made by someone who unquestionably was a decisionmaker, as just under a month later, Dr. Ghatan signed the letter informing Nowlin of his termination.

Mount Sinai's argument that a non-disabled employee, Lai, was treated in the same manner as Nowlin, *see* Motion at 19-20, is not persuasive. While Nowlin did identify Lai during his deposition as another "colleague[]" who had been "harassed or bullied at work," Nowlin Dep. Tr. 111:17-20, including because Dr. Panov referred to her as the other of the "weakest link[s]," *id.* 112:5-8, the comparison to Lai does little to help Mount Sinai. There is no evidence that Lai was suspended or terminated like Nowlin, nor were any comments allegedly made to Lai concerning a disability.

Lastly, Mount Sinai argues that it had a valid, nondiscriminatory reason for Nowlin's termination because Nowlin did not have an active NCCPA certification. *See* Motion at 20-21.

---

[8] Evidence that doctors at the Department of Neurosurgery were aware of Nowlin's speech disorder, and the possibly that it could have impacted his employment, comes also from Nowlin's testimony that Dr. Swarup repeatedly warned Nowlin that Dr. Panov wanted to fire him due to his speech, and that Dr. Swarup encouraged Nowlin to find another, less demanding, position. Nowlin Dep. Tr. at 39:20-49:24.

But questions of material fact abound here as well.  The parties dispute whether PAs at Mount Sinai needed to have that certification.  Pl. 56.1 Stmt. ¶ 73.  Some witnesses for Mount Sinai indicated their support for such a requirement.  *See* Flaim Decl. ¶ 3; Ghatan Dep. Tr. at 45:12-15; Isola Decl. ¶ 3; Schlachter Decl. ¶ 3.  Yet, at his deposition, Dr. Swarup said, "I don't think that [letting a certification lapse is] a fireable offense.  I hope not.  Because—I don't know.  I don't know if that's a fireable offense."  Swarup Dep. Tr. at 56:8-11.  Nowlin testified that when he told Fiumecaldo that his certification lapsed, Fiumecaldo replied, "[w]ell, they can't fire you for that."  Nowlin Dep. Tr. at 167:21-22.  While Fiumecaldo denied telling Nowlin that he could never be fired for lacking the active certification, Fiumecaldo agreed that he said that Nowlin would not immediately be fired.  Fiumecaldo Decl. ¶ 3.  And notably, the job listing for Nowlin's position after his termination listed the certification as only a "preferred" qualification, not a job requirement.  Friedman Decl., Exh. D at 1.

Accordingly, material issues of fact remain as to Nowlin's claims that he was terminated on account of his disability, in violation of the ADA, the NYSHRL, and the NYCHRL, and summary judgment is therefore denied as to those claims.

## C.  Hostile Work Environment

"To prevail on a hostile work environment claim, [Nowlin] must show (1) that the harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer."  *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (cleaned up).  The environment must be both "subjectively perceive[d] . . . as abusive" and "severe or pervasive enough to create an objectively hostile or abusive work environment."  *Id.* (quotation omitted).  Nowlin "must demonstrate either that a single incident was extraordinarily

severe, or that a series of incidents w[as] sufficiently continuous and concerted to have altered the conditions of [his] working environment." *Id.* (quotation omitted). The Court considers "the totality of the circumstances," including "proof of 'the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the plaintiff's work performance." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)) (alterations omitted). In addition to showing a hostile work environment, Nowlin must show that the environment occurred because of his disability. *See Williams v. Geiger*, 447 F. Supp. 3d 68, 86 (S.D.N.Y. 2020). The same standards apply under the NYSHRL. *See Duarte v. St. Barnabas Hosp.*, 265 F. Supp. 3d 325, 345-46 (S.D.N.Y. 2017).

The NYCHRL imposes a lower standard for hostile work environment claims, requiring that a plaintiff only show that he was treated "less well" than others without his protected characteristic, with "severity and pervasiveness . . . relevant only to . . . damages." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (describing sex-based claims); *see also Berger*, 304 F. Supp. 3d at 373 (applying the same standards to disability-based claims). However, "[t]he plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive," and "the NYCHRL is not a general civility code." *Mihalik*, 715 F.3d at 110 (quotations omitted). "The employer may prevail on summary judgment if it shows that a reasonable jury could conclude only that the conduct amounted to no more than a petty slight." *Id.* at 111.

Nowlin points to six alleged incidents that created a hostile work environment: (1) Dr. Swarup's encouragements for Nowlin to find a new job, (2) rumors that Dr. Ghatan and Dr. Panov disliked Nowlin, and that the latter wanted him fired, (3) false accusations of performance deficiencies, (4) Mount Sinai's decision to put Nowlin on a PIP, and (5) the hiring of Plaza as

Nowlin's alleged replacement, and (6) Dr. Ghatan's aforementioned comments about Nowlin's dog and inability to communicate effectively at the June 18, 2019 meeting.  Opposition at 15-16. Mount Sinai argues that Nowlin lacks evidence that these incidents were motivated by Nowlin's speech impediment.  Motion at 22-23.  As evidence that these incidents were related to his disability, Nowlin points to Dr. Swarup's alleged statement that Nowlin's speech motivated Dr. Panov's desire to fire him, Nowlin Dep. Tr. at 68:18-25, and the "repeated[] harassment by Drs. Ghatan and Swarup because of [Nowlin's] purported inability to communicate."  Opposition at 17.

"[I]t is . . . important in hostile work environment cases to exclude from consideration[] acts taken against the plaintiff that lack a linkage or correlation to the claimed ground of discrimination," unless there is "some circumstantial or other basis for inferring that incidents status-neutral on their face were in fact discriminatory."  *Paul v. Postgrauate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 168 (E.D.N.Y. 2015) (citing *Alfano v. Costello*, 294 F.3d 365, 377-78 (2d Cir. 2002)) (alterations omitted).  Most of Nowlin's proffered examples of harassment lack any link to his speech disorder.  *See* Nowlin Dep. Tr. at 44:21-24 (Dr. Swarup asked Nowlin whether he had found a new job), 50:7-24 (Nathanial Rodriguez said that Dr. Ghatan and Dr. Panov hated Nowlin), 54:16-23 (Dr. Swarup said that Dr. Ghatan and Dr. Panov hated Nowlin), 51:22-52:7 (Lai told Nowlin that Dr. Panov wanted to fire him because he was the "weakest link"); 117:17-119:1 (Nowlin wrongly blamed for May 6, 2018 incident), 120:3-121:24 (same, for March 30, 2018 incident), 122:25-124:24 (same, for May 10, 2018 incident), 175:24-178:18 (Nathanial Rodriguez said that Plaza was hired to replace Nowlin).  Without a link to Nowlin's disability or evidence of a discriminatory intent by their speaker, these incidents cannot support his hostile work

environment claims.[9]  *See Alfano*, 294 F.3d at 378 (explaining that evidence of an actor's discriminatory motivation can taint that actor's otherwise-neutral actions, but not neutral actions of other actors).

There are only a few exceptions where the comment arguably had a connection to Nowlin's speech disorder.  The first two—Dr. Ghatan's comments at the June 18, 2019 meeting regarding Nowlin's service dog, Nowlin Dep. Tr. at 193:2-25, and Nowlin's ability "to communicate effectively, *id.* at 194:23-195:7—are discussed above.  Dr. Ghatan allegedly made a similar comment about Nowlin's speech at the meeting regarding empathy.  *Id.* at 195:8-14.  For the reasons discussed above, a trier of fact could potentially view these events as implying that Dr. Ghatan had a discriminatory motive.  Nowlin also claimed that Dr. Swarup told Nowlin that Dr. Panov wanted to fire Nowlin because of his speech impediment.  *Id.* at 40:16-22, 43:12-44:14, 68:18-25.[10]

But even if Dr. Ghatan and Dr. Panov had discriminatory motives, those motives would only impute discriminatory intent to Nowlin's otherwise facially neutral allegations connected to

---

[9] The case Nowlin cites on this point, *Baez v. Anne Fontaine USA, Inc.*, No. 14 Civ. 6621 (KBF), 2017 WL 57858, at *5-6 (S.D.N.Y. Jan. 5, 2017), is distinguishable because it involved a sexually charged rumor spread by the plaintiff's coworkers throughout the organization, affecting the work environment.  And even there, the court viewed the case as borderline, "not . . . within the heartland of what federal, state, and city anti-discrimination statutes are meant to address."  *Id.* Nowlin makes no allegation of similar seriousness.

[10] Mount Sinai objects that Dr. Swarup's statements are inadmissible hearsay.  Reply at 8. But Dr. Swarup was a supervisor with input on personnel decisions regarding Nowlin, so his statement was vicariously a statement of Mount Sinai, Nowlin's party-opponent, and would appear to be admissible.  *See* Fed. R. Evid. 801(d)(2)(D); *United States v. Rioux*, 97 F.3d 648, 660-61 (2d Cir. 1996).  Any underlying statement by Dr. Panov further would appear likely to be admissible as a statement of Dr. Panov's then-existing state of mind.  *See* Fed. R. Evid. 803(3).  The case cited by Mount Sinai, *Konteye v New York City Department of Education*, No. 17 Civ. 2876 (RWL), 2019 WL 4418647, at *15 (S.D.N.Y. Apr. 10, 2019), is distinguishable because its chain of hearsay includes an unidentified coworker with no evident input on the employer's decision-making.  *See Rioux*, 97 F.3d at 660-61 (affirming admissibility of statements of supervisors who reported to employers regarding employees' performance).

Dr. Ghatan or Dr. Panov.  Those allegations are Dr. Swarup's statement that Dr. Panov wanted to fire Nowlin for his disability, and the alleged rumors from Lai, Dr. Swarup, and Rodriguez that Dr. Panov and Dr. Ghatan disliked Nowlin.[11]

On these facts, the alleged comments by Dr. Ghatan relating to Nowlin's communication skills and his service dog, and the alleged secondhand statements that two of Nowlin's many supervisors disliked him and that one wanted him fired due to his speech, cannot constitute a hostile work environment under the NYCHRL, let alone under the ADA or the NYSHRL.  Courts in this District have rejected NYCHRL hostile work environment claims for more serious conflicts with supervisors.  *See, e.g., Berger*, 304 F. Supp. 3d at 373-74 (the plaintiff's supervisor spread information about the plaintiff's discrimination complaint); *Agostini v. EmblemHealth, Inc.*, No. 16 Civ. 7119 (DLC), 2018 WL 3350324, at *2, 9 (July 9, 2018) (the plaintiff's supervisor aggressively rejected the plaintiff's disability accommodation request); *Moore v. Verizon*, No. 13 Civ. 6467 (RJS), 2016 WL 825001, at *13-14 (S.D.N.Y. Feb. 5, 2016) (the plaintiff's immediate supervisor repeatedly questioned the plaintiff's age and hearing loss); *Price v. Mount Sinai Hosp.*, No. 07 Civ. 11318 (BSJ), 2010 WL 4910218, at *1, 6 (S.D.N.Y. Nov. 23, 2010) (the plaintiff's supervisor encouraged the plaintiff to resign after rejecting the plaintiff's discrimination complaint).  Mount Sinai is thus entitled to summary judgment with respect to Nowlin's hostile work environment claim under the ADA, the NYSHRL, and the NYCHRL.

---

[11] While Dr. Panov forwarded the complaints related to the performance-related incidents on March 30, May 6, and May 10, 2018 to Soto, Dr. Panov did not initiate any of them, and instead only relayed documented complaints from others in the department.  *See* McEvoy Decl., Exh. 2 at 54-57.  Dr. Panov himself was not even present for these incidents.  *See id.*  Thus, even if the criticisms were indeed unfair, as Nowlin contends, Opposition at 16, the responsibility for them does not lie with Dr. Panov.  Moreover, as Nowlin argues, McNicholas, not Dr. Panov, initiated Nowlin's PIP.  *See id.* at 3.

### D.  Retaliation

A *prima facie* case of retaliation under the ADA requires showing that "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that [the] plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against [the] plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002) (quotation omitted); *accord Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 89 (2d Cir. 2010).  "If the plaintiff establishes his prima facie case, the burden shifts to the employer, who must then articulate a legitimate, non-retaliatory reason for the adverse action." *White v. Eastman Kodak Co.*, 368 F. App'x 200, 202 (2d Cir. 2010).  "If the employer carries that burden, the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the employer was a mere pretext for discrimination." *Id.* (quotations omitted).  NYSHRL claims are subject to the same requirements.  *See Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 268 (S.D.N.Y. 2020).

Here too, the NYCHRL's retaliation standard is broader than the ADA's or the NYSHRL's.  "Rather than requiring a plaintiff to show an adverse employment action, the NYCHRL only requires [him] to show that something happened that was reasonably likely to deter a person from engaging in protected activity." *Id.* (alterations and quotation omitted).  And the plaintiff need not show "but-for causation," only "that retaliation played any part in the employer's decision." *Id.* at 269 (quoting *Mihalik*, 715 F.3d at 116).  "Otherwise, a claim for retaliation" under the NYCHRL "faces the same requirements" as under the ADA and the NYSHRL.  *Id.* (quotation omitted).

Nowlin alleges that the decisions to place him on a PIP and to terminate him were in retaliation for his disability discrimination complaints.  Opposition at 19.  He concedes that the former claim can only lie, if at all, under the NYCHRL.  *See id.*

33

1.   **Performance Improvement Plan**

Mount Sinai does not argue that Nowlin failed to establish a *prima facie* case for retaliation

under the NYCHRL for the issuance of the PIP, and instead contends only that it has proffered a

legitimate, non-discriminatory reason.  Motion at 24-25.[12]  Its proffered non-discriminatory reason

is that "Neurosurgery believed [that Nowlin] could improve" his "well-documented issues with

[his] job performance," notably those on the 2017 Performance Appraisal that were repeated on

the PIP.  *Id.*

There is evidence from which a jury could infer that the decision to place Nowlin on a PIP

was pretextual.  First, McNicholas came to the decision to put Nowlin on a PIP in the course of

her investigation into Nowlin's disability discrimination complaints.  McNicholas Dep. Tr. at

184:15-185:6; Friedman Decl., Exh. J (August 2, 2018 email from McNicholas to Werner recalling

a meeting regarding Nowlin's "accommodation request and . . . performance issues," at which

McNicholas recommended a PIP, which would "not [be] discipline but feedback on

performance").  McNicholas also acknowledged that her job would not ordinarily include initiating

PIPs, McNicholas Dep. Tr. at 17:17-18:24, and a jury could reasonably find her departure from

her typical practice curious in the circumstances.   Second, though the PIP was explicitly linked to

the 2017 Performance Appraisal, Mount Sinai did not decide to put Nowlin on the PIP until well

after that appraisal, but soon after Nowlin requested an accommodation for his purported disability.

McNicholas herself testified that the normal practice for issuance of a PIP based on a 2017

appraisal would have been to put Nowlin on the PIP at the end of 2017, not in July 2018.  *Id.* at

181:7-14.  Indeed, Nowlin's argument that "if not for his complaint, [Nowlin] never would have

---

[12] Nowlin engaged in protected activity by submitting a reasonable accommodation
request, s*ee Weixel v. Bd. of Educ. of N.Y.*, 331 F.3d 261, 282 (2d Cir. 2003), and complaining to
McNicholas of discrimination, *see Hatch v. Brennan*, 792 F. App'x 875, 879 (2d Cir. 2019).

received a PIP, as he had not for months," appears to be a fair deduction from the evidence. Opposition at 20. It appears that Nowlin's reasonable accommodation meeting with McNicholas prompted her to dig into his performance and ultimately initiate a PIP. *See, e.g.*, McNicholas Dep. Tr. at 72:5-73:12; Friedman Decl., Exh. J. Mount Sinai argues that a jury could also construe McNicholas's activities as innocent, *see* Reply at 8-9, but that of course does not suffice for it to prevail on summary judgment. Mount Sinai's motion is thus denied with respect to Nowlin's NYCHRL claim related to the PIP.

## 2. Termination

Mount Sinai argues that Nowlin fails to establish that his accommodation request caused his termination, so he has no *prima facie* case with respect to his termination. Motion at 25. Nowlin's last complaint about his disability occurred in the summer of 2018. At that time, he submitted a complaint to Mount Sinai's Corporate Compliance regarding, among other things, the denial of his requested accommodation. Pl. 56.1 Stmt. ¶ 64; Nowlin Dep. Tr. at 160:13-23 (recalling that his meeting with Corporate Compliance likely occurred in July or August 2018). And also around that time, on August 20, 2018, Nowlin met with McNicholas and Budnick to discuss various complaints, although it is unclear if he raised his disability at this meeting. *See* Pl. 56.1 Stmt. ¶¶ 66-69; Nowlin Dep. Tr. at 157:19-158:25. Assuming that the August 20 meeting entailed a complaint about his disability, Nowlin's termination occurred on July 19, 2019, eleven months later. Valerio-Ramcharran Decl. ¶ 9. Even under the more relaxed standard of the NYCHRL, courts require much closer temporal proximity to generate an inference of discrimination. *See, e.g., Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 686-87 (S.D.N.Y. 2012); *Adams-Flores v. City of New York*, No. 18 Civ. 12150 (JMF), 2021 WL 918041, at *4 (S.D.N.Y. Mar. 10, 2021); *Moore*, 2016 WL 825001, at *15.

To rectify the gap, Nowlin points to three events in the interim to "extend[]" the "length of time from which the inference can be drawn": (1) the PIP in July 2018, (2) Mount Sinai's hiring of Plaza in November 2018, and (3) Dr. Ghatan's alleged criticism of Nowlin for lacking empathy at an employee meeting.  Opposition at 21.  But the first occurred over a year prior to Nowlin's termination, the second did not harm Nowlin and had no evident relation to Nowlin's disability, and the third occurred appeared to occur in April 2019, *see* Complaint ¶ 50, eight months after Nowlin's last alleged protected activity and even longer after the PIP.

Nowlin's argument that Mount Sinai may have just waited for an opportune time to fire him is similarly unavailing.  The cases Nowlin points to—*Espinal v. Goord*, 558 F.3d 119 (2d Cir. 2009) and *Geras v. Hempstead Union Free School District*, 149 F. Supp. 3d 300 (E.D.N.Y. 2015)—involve gaps of time approximately half as long as the gap in this case.  *See Espinal*, 558 F.3d at 129-30; *Geras*, 149 F. Supp. 3d at 332.  Moreover, unlike in *Espinal*, where the allegedly retaliating officer-defendants told the plaintiff-inmate that "this is what happens to inmates when they submit law suits against us," 558 F.3d at 122 (quotation and alteration omitted), Nowlin does not allege that anyone explicitly told him he would be retaliated against.  And unlike in *Geras*, in which a member of the defendant school board attempted to fire the plaintiff "at the first" school board meeting following the plaintiff's protected activity, 149 F. Supp. 3d at 332, Mount Sinai passed up on a much earlier opportunity to fire Nowlin—the conclusion of his PIP in September 2018.  Pl. 56.1 Stmt. ¶ 72.  The Court thus grants summary judgment to Mount Sinai on Nowlin's claims of retaliation resulting in his termination.

## IV.  Conclusion

For the foregoing reasons, the Court grants Mount Sinai summary judgment with respect to Nowlin's hostile work environment and termination-based retaliation claims, and denies Mount

Sinai summary judgment with respect to Nowlin's failure-to-accommodate, disability discrimination resulting in termination, and PIP-based NYCHRL retaliation claims. The Clerk of Court is respectfully directed to close the motion pending at Docket Number 31.

       SO ORDERED.

Dated: March 31, 2022
      New York, New York
                                       JOHN P. CRONAN
                             United States District Judge